IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | Criminal No. 06-0162 |
| | ) | ELECTRONICALLY FILED |
| JOSEPH R. LEE | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW ON DEFENDANT'S MOTION TO SUPPRESS

### I. PROCEDURAL HISTORY

A federal grand jury indicted defendant, Joseph Lee, in a one-count indictment that alleging he, being a convicted felon, possessed a firearm in violation of Title 18, United States Code, Section 922(g)(1). On June 22, 2007, defendant filed a Motion to Suppress Statements (Document No. 48), and a Motion to Suppress Audio Tape (Document No. 49), alleging that (1) his statements after arrest on July 12, 2005 should be suppressed because they were not voluntary; and, (2) the audiotape recording of the police dispatch recording during his police chase on a date prior to his arrest (June 27, 2005) should be suppressed because it is inaudible and otherwise inadmissible under *United States v. Starks*, 515 F.2d 112 (3d Cir. 1975). A Suppression Hearing was held before this Court on October 5, 2007, during which the government called Lieutenant Kevin Kraus (hereinafter "Kraus") as its sole witness. After the Court ordered the parties to jointly have a transcript made of the audiotape recording in question, and a transcript was made, albeit by Kraus himself (over defendant's objection), on March 27, 2008, a Supplemental Suppression Hearing was held and the government presented the audiotape recording, with the aid of the transcript.

After hearing the testimony of Kraus, and after listening to the audiotape and reviewing the written transcript of the record, and after careful consideration of the government's Proposed Findings of Fact and Conclusions of Law, as well as the defendant's Proposed Findings of Fact and Conclusions of Law, this Court will deny defendant's Motions to Suppress (Document Nos. 48 and 49).

**II.     FINDINGS OF FACT**

**A. As to Statement:**

1. Lieutenant Kraus, who has been a police officer for approximately 16 years, is a member of the Pittsburgh Bureau of Police, and oversees the major crime section of the investigations branch. (Transcript of Suppression Hearing ("S.H.") October 5, 2007 (Document No. 65) at 5-6).

2. On June 27, 2005, Kraus observed that defendant fled a traffic stop in the Hill District section of the city of Pittsburgh, and at that time, Kraus believed that there was probable cause for state firearms violations against the defendant.

3. However, Kraus was unable to arrest defendant on that particular date, and he obtained an arrest warrant for defendant on June 29, 2005. S.H. at 7. (The police dispatch audiotape of the police chase that ensued on that date is discussed in Section B below).

4. On July 12, 2005, while Kraus was working in his office at police headquarters at 1203 Western Avenue, he received information that the City of Pittsburgh Zone 2 police units and the City of Pittsburgh Housing Authority officers were in pursuit of defendant, and that they had him contained in an apartment at 2199 Elmore Square, Apartment 176. S.H. at 7.

5. Kraus then departed his office and when he arrived on the scene, he made plans with the special response team and other officers, and defendant was found in Apartment 176, while hiding in a couch which had the bottom portion cut out of it. S.H. at 8.

6. Defendant was then handcuffed at approximately 6:45 p.m., was transported by the Housing Authority Police immediately to Pittsburgh headquarters (Kraus' office), and he was placed in the homicide interview room. Kraus remained on the scene, where he obtained written consent to search Apartment 176 with other officers, and Kraus returned to headquarters approximately 45 to 60 minutes later. S.H. at 9.

7. When Kraus arrived at the headquarters, defendant was sitting alone shackled at a table in the homicide interview room, which is approximately eight or nine feet by six or seven feet in size, and has no windows and one door. S.H. at 11. Kraus could not recall whether defendant was also handcuffed but he testified that it would not be uncommon for a defendant to be handcuffed. S.H. at 11.

8. At approximately 7:42 p.m, Kraus then read defendant his *Miranda* warnings and presented defendant with a *Miranda* waiver form. Kraus went over the form with defendant and defendant consented, signing the form after each section, and indicating that he was willing to speak with Kraus. S.H. at 12-16, 18. The signed *Miranda* form was entered into evidence as Government's Exhibit 1.

9. Kraus then had a conversation which he described as "pretty cordial" with defendant about the incidents that took place on June 27, 2005. Kraus testified that defendant thanked Kraus for arresting a man by the name of Ernest Harris years ago because defendant believed that Harris had

the intention of killing defendant. Kraus and defendant also discussed other homicides. S.H. at 16, 32.

10. During the one-on-one interrogation, which lasted approximately one and half to two hours, defendant was provided food (specifically, a Big Mac, french fries, and a cola drink) and cigarettes. S.H. at 16-18, 35.

11. Kraus observed defendant during the interrogation, and stated that defendant did not exhibit any indication that he was under the influence of drugs or alcohol, that his mental and physical health was fine, and that there was no evidence that defendant's intelligence or educational background limited his ability to understand the nature of his consent. S.H. at 17.

12. The Court, after listening to the testimony of Kraus and observing his demeanor, finds his testimony to be credible.

**B. As to Audiotape:**

13. Pursuant to this Court's request at the first suppression hearing that the audiotape of the police chase that took place on June 27, 2005, prior to his arrest on July 12, 2005, be transcribed, at the supplemental suppression hearing on March 27, 2008, the government introduced and played an audiotape recording (previously marked as Government Exhibit 3) of the police chase on a date prior to his arrest (referenced in ¶ 2 above) with the aid of the transcript (marked as Supplemental Suppression Hearing as Government Exhibit 3). S.H. at 18-19.

13. The audiotape was not the original tape of the police radio transmissions on June 27, 2005. Rather, the tape presented by the government was a copy of the police dispatch audiotape (the government failed to request that the original be retained). S.H. at 23.

14. Kraus testified that from his review of the tape, it appeared to be a true and accurate copy of the dispatch in question. S.H. at 24.

14. After listening to tape with the aid of the transcript prepared by Kraus, this Court finds that while some portions are unintelligible (and are indeed marked as such in the transcript), the unintelligible portions are not so great as to render the tape as a whole inaudible.

### III.  CONCLUSIONS OF LAW

**A. As to Statement**:

1. Because defendant was subjected to a "custodial interrogation," thus triggering his *Miranda* rights, the issue is whether defendant validly waived his rights. *Miranda v. Arizona*, 384 U.S. 436, 478 (1966).

2. A waiver of defendant's rights is valid if it is knowing, intelligent, and voluntary. *United States v. Pruden*, 398 F.3d 241, 245 (3d Cir. 2005)(citing *Miranda*, 384 U.S. at 444).

3. To determine whether a statement is voluntary, the Court must consider "the totality of all the surrounding circumstances - - both the characteristics of the accused and the details of the interrogation." *Dickerson v. United States*, 530 U.S. 428, 433 (2000)(citing *Schneckcloth v. Bustamante*, 412 U.S. 218, 226 (1973)).

4. The Court finds that defendant's statements were voluntary.

5. First, there is no evidence that defendant suffered from any physical or mental disability.

6. Second, the interrogation, which lasted for approximately one and a half to two hours, with breaks, took place only after Kraus obtained a valid waiver.

7. Third, Kraus testified that the interview could be described as cordial and during the interview process, defendant was provided with food, drink, and cigarettes.

8. With respect to whether a statement is voluntary, the question is whether "the suspect's will was overborne in such a way as to render his confession the production of coercion." *Lam v. Kelchner*, 304 F.3d 256, 264 (3d Cir. 2002)(quoting *Arizona v. Fulminante*, 499 U.S. 279, 288 (1991)). In determining whether the confession was given voluntarily, the Court must determine whether the confession was the product of an essentially free and unconstrained choice by its maker, and whether it was product of rational intellect and free will. *United States v. Bethancourt*, 65 F.3d 1074, 1078 (3d Cir. 1995).

8. After examining the totality of circumstances, the Court finds that defendant's statements were voluntary and there was no evidence of coercion. Rather, defendant's statements were the "product of rational intellect and free will,"*Bethancourt*, 65 F.3d at 1078, and accordingly, defendant's motion to suppress statements (Document No. 48) is DENIED.

**B. As to Audiotape**:

9. Under the standards set forth in *United States v. Starks*, 515 F.2d 112 (3d Cir. 1975), once a defendant makes a "colorable attack" on a tape's authenticity and accuracy, the burden on those issues shifts to the government, and the government is required to prove its chain of custody. *Id.* at 122.

10. In short, the government must provide clear and convincing evidence of authenticity and accuracy as a foundation for the admission of such recordings. *Id.*

11. A foundation must be established by showing the following facts:

(a) That the recording device was capable of taking the conversation now offered in

evidence.
(b) That the operator of the device was competent to operate the device.
(c) That the recording is authentic and correct.
(d) That changes, additions or deletions have not been made in the recording.
(e) That the recording has been preserved in a manner that is shown to the court.
(f) That the speakers are identified.
(g) That the conversation elicited was made voluntarily and in good faith, without any kind of inducement.

*Id.* at 121, quoting *United States v. McKeever,* 169 F.Supp. 426, 430 (S.D. N.Y. 1958).

12. Although the audiotape recording is not the original and the government failed to request that the original tape be retained, the Court finds that the government has demonstrated the authenticity of the copied tape, and that the government has established the above listed factors, including that "the recording has been preserved in a manner that is shown to the court." *Id.* at 121.

13. Defendant further argues that the tape is inaudible and thus inadmissible under Rule 403 of the Federal Rules of Evidence. Defendant also argues that it should not be admissible because the tape's inaudibility and the nature of the police chase renders it more prejudicial than probative, since defendant does not dispute many of the facts that the government's introduction of the audiotape purports to establish.[1]

14. A trial court "ha[s] considerable discretion regarding the admissibility of a tape recording where there is a serious question of its audibility." *United States v. Jackson*, 649 F.2d 967, 977 (3d Cir. 1981). As a general rule, recordings are admissible unless the unintelligible portions are "so substantial as to render the recording as a whole untrustworthy.'" *United States v. Powers,* 75 F.3d 335, 341 (7th Cir. 1996).

---

[1]Defendant presented oral argument on the prejudicial effect of the nature of the police chase at the Supplemental Suppression Hearing.

7

15. As rehearsed in the findings of fact, after hearing the tape in open court and reviewing the transcript of the tape made by Kraus, a participant in the event, the Court was able to hear and understand a sufficient amount of the conversation to permit its use at trial.

16. The Court recognizes, as does the government (and as noted on the transcript), that some portions of the tape are unintelligible. Those unintelligible portions are not, however, "so substantial as to render the recording as a whole untrustworthy." *Powers* at 341.

17. Furthermore, the probative value of the audiotape is not outweighed by the prejudicial effect of the tape. Although defendant argues that the audiotape's probative value is weak because he does not intend to dispute the facts set forth therein, the Court disagrees. The audiotape has probative value because it could be introduced by the government to confirm the testimony of Kraus. Thus, the audiotape is admissible under Fed. R. Evid. 403.[2]

18. Accordingly, defendant's motion to suppress the audiotape (Document No. 49) is DENIED.

19. For the reasons set forth hereinabove, defendant's motion to suppress statements (Document No. 48) and defendant's motion to suppress audio tape (Document No. 49) are DENIED.

SO ORDERED this 25th day of April, 2008.

s/Arthur J. Schwab
Arthur J. Schwab
United States District Judge

cc: All counsel of record

---

[2] If, in fact, defendant enters into a stipulation which is suitable to the government on this subject thus potentially eliminating the need for the audiotape, the Court is prepared to reconsider its ruling at that time.